Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| DR. RAÚL A. PORRO VIZCARRA<br><br>Apelante<br><br>v.<br><br>DOCTORS' CENTER HOSPITAL INC.<br><br>Apelada | KLAN202401043 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Arecibo<br><br>Caso Núm.:<br>C DP2012-0167 (404)<br><br>Sobre:<br>Interferencia Torticera (Int. Indebida) |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 24 de marzo de 2025.

Comparece ante nos, el Dr. Raúl Porro Vizcarra (Dr. Porro), su esposa, Lourdes Cabrera Rodríguez, la sociedad legal de gananciales constituida entre ambos y DC Anesthesia PSC (en conjunto, la parte apelante), mediante recurso de *Apelación* presentado el 22 de noviembre de 2024, y nos solicita que revoquemos la *Sentencia Sumaria* emitida el 23 de septiembre de 2024, notificada el 30 de septiembre de 2024, por el Tribunal de Primera Instancia, Sala Superior de Arecibo (TPI o foro primario). En dicha *Sentencia*, el TPI declaró Ha Lugar una moción de sentencia sumaria parcial presentada por Doctors' Center Hospital (DCH o apelado) en la cual se solicitó la desestimación del caso por no existir nexo causal entre la cancelación de un contrato pactado entre DCH y el Dr. Porro y los daños presuntamente sufridos por la parte apelante.

Por los fundamentos que exponemos a continuación, ***confirmamos*** la *Sentencia Sumaria* apelada, puesto que no existen hechos materiales en controversia genuina.

Número Identificador

SEN2025 _____

**I.**

El presente caso se remonta al 1 de abril de 2007, cuando DCH y el Dr. Porro suscribieron el contrato intitulado *"Agreement between anesthesiologist and Doctors' Center Hospital"* (contrato). En dicho contrato, el Dr. Porro se obligó a dirigir el Departamento de Anestesiología de DCH, lo cual incluía: el suministro de servicios de anestesiología; la contratación y mantenimiento del plantel de empleados adscritos al Departamento; y **la contratación con los planes médicos y contratación directa con los clientes que carecieran de uno.**

Por su parte, DCH se obligó a suministrar los medicamentos e instalaciones necesarias para que el Departamento de Anestesiología pudiera llevar a cabo sus funciones. El contrato tuvo una vigencia de siete (7) años; es decir, hasta el 31 de marzo de 2014. En el mismo, también se estipuló la manera en que se podían dar por terminadas las obligaciones contractuales.

No obstante, el 26 de abril de 2012, el Dr. Porro envió una carta al Dr. Carlos Blanco Ramos (Dr. Blanco), presidente de DCH. En específico, la misiva expresó lo siguiente:

> Es mi interés continuar con el acuerdo de servicios hasta su terminación. No obstante, para poder continuar rindiendo el servicio solicito que el Hospital asuma el costo de las anestesistas. El elevado costo de los anestesistas no da margen para sostener la operación de anestesia en el Hospital. De hecho, continuamente carecemos de fondos para el pago de las nóminas y las estamos subsidiando con líneas de crédito. La situación es tan crítica que al presente no tenemos dinero para pagar la nómina del próximo 30 de abril de 2012. Entendemos que esta petición es totalmente razonable y es la manera en que opera la industria hospitalaria.
> Del Hospital no interesar renegociar los términos del acuerdo vigente, estoy dispuesto a terminar el acuerdo y a relevar al Hospital del cumplimiento específico con el término, sujeto a que el Hospital me compense por la terminación del acuerdo. De esta manera el Hospital podrá contratar directamente anestesistas y anestesiólogos.
> Agradezco si me puede confirmar la postura del Hospital en o antes del próximo 30 de abril de 2012 antes del mediodía. De no llegar a un acuerdo en torno a lo anterior, estaría entonces considerando la alternativa de dar por terminado el acuerdo unilateralmente, derecho que me asiste por tratarse de un acuerdo de servicios personales. Sin embargo, confío

en que podemos renegociar los términos del acuerdo de una manera rápida y amistosa.

Ante esa comunicación, el 30 de abril de 2012, el Dr. Blanco y la junta de directores de DCH, remitió una carta al Dr. Porro, en la cual se le notificó la resolución del contrato de **forma inmediata** debido a su presunta incapacidad para cumplir con las obligaciones incurridas.

En vista de lo anterior, la parte apelante instó una demanda por incumplimiento de contrato, y daños y perjuicios en contra de DCH[1]. En esencia, la parte apelante alegó que DCH incumplió con el Contrato al resolverlo unilateralmente, por lo cual, infringió los procedimientos establecidos para ello en la Cláusula 8.2 del contrato[2].

Así las cosas, el 4 de septiembre de 2013, fue celebrada la Conferencia con Antelación a Juicio y Vista Transaccional. El foro primario resolvió que, según acordado por las partes, se bifurcaron los procedimientos para examinar el aspecto contractual y limitar el descubrimiento de prueba a tales fines.

Luego de varios trámites procesales, se celebró el juicio en su fondo y, en consecuencia, el TPI dictó una *Sentencia Parcial* el 21 de marzo de 2019.

En cuanto a los daños y al finalizar el descubrimiento de prueba, el 10 de junio de 2024, el DCH presentó una *Moción de Sentencia Sumaria.* En esta, solicitó que se determinara que no existe relación causal entre la cancelación del contrato por parte de

---

[1] En la demanda, además de DCH, se incluyeron como partes demandadas al Dr. Ricardo D. Galán Vázquez, el Dr. Adalberto López Avilés, su esposa Ginette Izquierdo Rodríguez y la Sociedad de Bienes Gananciales constituida por estos, Galope Anesthesia Services Corp., y Galope Anesthesia Services. Sin embargo, la causa de acción contra estos fue desistida.

[2] Al respecto, en la Cláusula 8.2 del contrato se dispuso lo siguiente:
8.2 <u>Default and Termination</u>:
In the event of a default, either party shall give notice to the other that such other party has defaulted in the performance of any obligation under this agreement and, if such default is not cured within ninety (90) days following the giving of such notice, the party giving such notice, shall have the right to immediately terminate this Agreement.

DCH y los alegados daños económicos solicitados por la parte apelante.

El 22 de julio de 2024, la parte apelante se opuso. Adujo la existencia de hechos materiales en controversia en cuanto a la relación causal de los daños y la terminación del contrato.

El 23 de septiembre de 2024, el TPI emitió una *Sentencia Sumaria* en la que declaró Ha Lugar la *Moción de Sentencia Sumaria* presentada por el apelado y, consecuentemente, desestimó la demanda de autos. El foro primario consignó las siguientes determinaciones de hechos:

1. El Dr. Porro es médico anestesiólogo y actualmente reside en el estado de Delaware, Estados Unidos de América.
2. El Dr. Porro está casado con la co-demandante Lourdes Cabrera Rodríguez, con quien tiene constituida una Sociedad Legal de Gananciales.
3. DCH es una corporación organizada bajo las leyes del Estado Libre Asociado de Puerto Rico que opera y tiene oficinas en una facilidad hospitalaria conocida como "Doctors' Center Hospital Manatí", en Manatí, Puerto Rico.
4. El Dr. Carlos Blanco Ramos es Presidente de DCH y de su Junta de Directores.
5. El 1ro de abril de 2007, el Dr. Porro y DCH suscribieron un contrato intitulado *"Agreement between Anesthesiologist and DCH"* (en adelante, el "Contrato"), para que el Dr. Porro brindara servicios de anestesia con exclusividad y dirigiera el Departamento de Anestesia del "Doctor's Center Hospital Manatí" (en adelante, "el Hospital").
6. Previo al otorgamiento del Contrato, en enero del 2007, el Dr. Porro creó la corporación DC Anesthesia P.S.C. (en adelante, "DC Anesthesia") para que fungiera como la responsable de contratar con los planes médicos, contratar con los pacientes y era la entidad corporativa que empleaba a los anestesistas, los empleados administrativos y a los anestesiólogos en el Hospital.
7. El Contrato tenía un término de vigencia de 7 años, desde el 1ro de abril de 2007 al 31 de marzo de 2014.
8. El Contrato proveía al Dr. Porro la exclusividad de servicios de anestesia en el Hospital.
9. Conforme al Contrato, DCH no tenía que pagarle al Dr. Porro, ni a DC Anesthesia, por el servicio brindado porque estos se encargarían de contratar las tarifas con los planes médicos y de facturarle a los planes médicos y a pacientes directamente.
10. Bajo el Contrato, era responsabilidad del Dr. Porro encargarse del costo de nómina del personal de DC Anesthesia, incluyendo anestesistas y el personal administrativo del Departamento de Anestesia.
11. DC Anesthesia facturaba por los servicios rendidos por el Dr. Porro, cobraba los mismos y registraba la facturación y cobros en sus récords de contabilidad, pagaba todos los costos y gastos operacionales

relacionados con la prestación de los servicios, pagaba los gastos generales y administrativos relacionados, y pagaba los servicios profesionales y/o salarios del personal que prestaba los servicios, incluyendo entre estos al Dr. Porro.

12. A mediados del 2011, el Gobierno de Puerto Rico canceló la contratación del servicio de salud con MCS, y, en octubre de 2011, seleccionó y nombró a Triple S como el proveedor del Plan de Salud del Gobierno de Puerto Rico.

13. A raíz de lo anterior, la Parte Demandante comenzó a enfrentar dificultades administrativas y económicas, las cuales llevaron a despedir personal tanto administrativo como técnico como es reducir beneficios de vacaciones, enfermedad, aportación al plan médico, entre otras.

14. Para febrero de 2012, la Parte Demandante no podía despedir a más anestesiólogos porque "si no, no se podía cubrir el servicio".

15. El Dr. Porro admitió que, al 26 de abril de 2012, la línea de crédito comercial de DC Anesthesia estaba casi al tope y que los únicos recursos alternos que tenía para pagar la nómina era hipotecar su casa, ahorros y tomar una línea de crédito adicional.

16. El 26 de abril de 2012, el Dr. Porro envió una carta a DCH, en la cual informaba su incapacidad de mantener la operación del Departamento de Anestesia del Hospital.

17. En la carta del 26 de abril de 2012 el Dr. Porro solicitó a DCH que se hiciera cargo del pago de las anestesistas que contractualmente le correspondía a él. Además, en dicha comunicación el Dr. Porro expresó al Dr. Carlos Blanco, presidente de DCH, que, de no interesarle renegociar los términos del acuerdo vigente, estaba en la disposición de terminar el acuerdo y relevar al hospital del cumplimiento específico con el término, sujeto a que el hospital le compensara por la terminación del contrato.

18. El interés del Dr. Porro al enviar la carta del 26 de abril de 2012 surge de la misma y era continuar con el Contrato de servicios de anestesia con DCH hasta su terminación.

19. Al 26 de abril de 2012, DC Anesthesia no contaba con los fondos suficientes en la cuenta para pagar la nómina de sus empleados a ser pagada el 30 de abril del 2012.

20. El 30 de abril de 2012, DCH canceló el Contrato con el Dr. Porro.

21. El Dr. Porro declaró que "cuando comenzó en Doctors' Center Hospital, un 10% de los pacientes eran de la Reforma, pero que el porcentaje ascendió a un 40% por el cambio con la Reforma de Salud de Triple-S".

22. Debido a este cambio, el Dr. Porro indicó que "una vez llegó el 1 de noviembre de 2011, se le otorgó un contrato pasivo con la Reforma, en el cual decía que automáticamente yo estoy aceptando la Reforma y que no tenía que firmar contrato con la Reforma de Triple-S y que para ver las tarifas que se iban a pagar, que buscara en tal "site".

23. El Dr. Porro indicó que al dirigirse al 'site' y corroborar las tarifas, se percató que había un "decremento de las tarifas de Triple-S Regular versus Reforma, de un 78% a un 80%". Por lo que no quería aceptar el contrato pasivo y tenía que "negociar un nuevo contrato".

24. El Dr. Porro declaró que "para el año 2011, MCS Reforma le adeudaba unos 500 mil dólares, de los cuales solo obtuvo alrededor de unos 300 mil".

25. El Dr. Porro admitió que recibía un salario de DC Anesthesia de $8,600 quincenales, pero, desde noviembre de 2011 hasta abril de 2012, él no había cobrado su salario durante estos meses debido a que "en ese momento los ingresos eran más bajos que los gastos de la corporación".

26. Desde noviembre de 2011 el Dr. Porro reconoció en sus comunicaciones el potencial colapso financiero de DC Anesthesia, lo cual este autodenominó como la "crónica de una muerte anunciada".

27. En la vista en su fondo, celebrada el 3 de diciembre de 2018, el Dr. Porro declaró que, para el 26 de abril de 2012, llevaba tres o cuatro meses haciendo acercamientos al Dr. Carlos Blanco, Presidente de DCH, sobre la situación económica que las tarifas de Triple S Mi Salud estaban ocasionando en su compañía, puesto que DC Anesthesia estaba teniendo más gastos que ingresos debido al problema tarifario de Triple S Mi Salud. Incluso, admitió que estaba teniendo problemas con los pagos de nóminas desde al menos comenzando el año 2012.

28. Dr. Porro comenzó a trabajar inmediatamente después de la cancelación del contrato con DCH con ingresos similares y/o superiores posteriormente.

29. En el 2016 el Dr. Porro y su esposa se mudaron al estado de Delaware y su salario fue de $370,000 y luego aumentó a $400,000.

30. El Departamento de Estado del Estado Libre Asociado de Puerto Rico revocó el certificado de incorporación de DC Anesthesia y dicha compañía fue cancelada el 18 de octubre de 2014, según surge de Certificado de Revocación del Certificado de Incorporación expedido el 24 de octubre de 2014.

31. DC Anesthesia no rindió planillas de contribución sobre ingresos para los periodos contributivos 2011, 2012 y 2013, según surge de Certificación Manual de Radicación de Planilla de Contribución sobre Ingresos expedida por el Departamento de Hacienda de Puerto Rico el 13 de marzo de 2023.

En su razonamiento para disponer sumariamente de la controversia, el TPI se basó en que la parte apelante no logró controvertir con prueba fehaciente los hechos propuestos por el DCH sobre la inexistencia de relación causal entre los daños reclamados y el incumplimiento contractual de DCH. Al respecto, razonó el foro primario lo siguiente:

> **DCH demostró que la Parte Demandante se encontraba en déficit financiero desde antes de la cancelación de contrato**. **Las admisiones del Dr. Porro durante el extenso trámite del presente caso, así como la demás prueba documental y pericial analizada, establecen que, para el año 2011, el Plan Médico del Gobierno "La Reforma" bajo administración de MCS le adeudaba a DC Anesthesia unos cientos de miles de dólares**. **Pero la situación se agravó con el cambio a Triple S y la reducción en las tarifas de los servicios, junto con el aumento del porcentaje de pacientes acogidos al sistema de salud**

**pública**. **Esto conllevó la disminución en los ingresos recibidos por DC Anesthesia**.

Los problemas económicos de DC Anesthesia provocaron lo siguiente: que el Dr. Porro no cobrara salarios desde noviembre de 2011 hasta abril 2012 porque los ingresos eran más bajos que los gastos de la corporación; que se tomaran medidas administrativas de austeridad, tales como: ajustar horas extras de empleados, eliminación de incentivos, días feriados sin paga, descuento salarial para los que llegaran tarde, la eliminación del plan médico a partir del 1 de abril de 2012, la eliminación de días de vacaciones, de enfermedad y del día libre por cumpleaños, y eliminar pagos de educación continua y colegiación; despido de múltiples empleados y personal administrativo, pero ya para febrero de 2012, no podía despedir a más anestesiólogos porque no serían suficientes para cubrir el servicio; problemas con los pagos de nóminas; líneas de crédito casi al tope.

**Tampoco el informe del perito de la Parte Demandante, Reynaldo Quiñones logró establecer una relación causal entre los daños económicos alegados y la determinación de cancelación de contrato por parte de DCH**. Asimismo, no evidencia un reclamo válido de pérdida económica de DC Anesthesia ni de los demás demandantes. Las deficiencias contenidas en dicho informe no permiten que este Tribunal le conceda valor probatorio alguno ya que no contempló la situación económica real de la parte Demandante al momento de la cancelación del contrato, según admisiones del Dr. Porro. Además, el informe calcula las ganancias generadas a base de los ingresos devengados durante el periodo que DC Anesthesia ofrecía servicios bajo las tarifas de MSC y no bajo el tarifario reducido aplicable de Triple S. Incluso, el informe pericial de la parte Demandante no contempló las planillas de DC Anesthesia de los años contributivos 2011 en adelante, periodo crítico en la ejecución del Contrato con DCH, ya que dicha entidad no rindió las mismas y su certificado de incorporación fue revocado por el Departamento de Estado.

Cabe señalar que el Dr. Porro reconoció que comenzó a trabajar inmediatamente con ingresos similares y posteriormente superiores, hoy día duplicado el sueldo que recibía de DC Anesthesia. Por tanto, **este no logró establecer ganancias netas dejadas de recibir luego de la cancelación del Contrato**[3].

Inconforme, el 15 de octubre de 2024, la parte apelante presentó una *Moción de Determinaciones de Hechos Adicionales, Enmiendas a Determinaciones Iniciales, Conclusiones de Derecho y Reconsideración de la Sentencia Dictada*. Esta fue rechazada por el TPI el 17 de octubre de 2024.

Insatisfechos aún, el 22 de noviembre de 2024, la parte apelante recurrió ante este foro vía recurso de *Apelación* y señaló los siguientes errores:

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONCLUIR SUMARIAMENTE QUE NO EXISTE

---

[3] Apéndice de los Apelantes, págs. 10-11 (énfasis suplido).

RELACIÓN CAUSAL ENTRE LA CANCELACIÓN DEL CONTRATO POR PARTE DE DOCTOR'S CENTER HOSPITAL, INC. Y LOS DAÑOS CONTRACTUALES RECLAMADOS POR LOS DEMANDANTES.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR SUMARIAMENTE QUE EL INFORME DEL PERITO DE LA PARTE DEMANDANTE, REYNALDO QUIÑONES, NO LOGRÓ ESTABLECER UNA RELACIÓN CAUSAL ENTRE LOS DAÑOS ECONÓMICOS ALEGADOS Y LA DETERMINACIÓN DE CANCELACIÓN DE CONTRATO POR PARTE DE DOCTOR'S CENTER HOSPITAL, INC.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DESESTIMAR SUMARIAMENTE Y CON PERJUICIO EL CASO DE EPÍGRAFE POR ENTENDER QUE NO EXISTE RELACIÓN CAUSAL ENTRE LA CANCELACIÓN DEL CONTRATO POR PARTE DE DOCTOR'S CENTER HOSPITAL, INC. Y LOS DAÑOS CONTRACTUALES RECLAMADOS POR LA PARTE DEMANDANTE.

El 9 de enero de 2025, el apelado presentó su escrito en oposición al recurso, intitulado *Alegato del Apelado Doctors' Center Hospital, Inc.*

Con el beneficio de la comparecencia de las partes y examinados los escritos, así como los anejos presentados, estamos en posición de resolver.

## II.

### -A-

El Tribunal Supremo de Puerto Rico ha expresado en varias ocasiones que la sentencia sumaria es un remedio extraordinario y discrecional que sólo se debe conceder cuando no existe una controversia genuina de hechos materiales y lo que resta es aplicar el derecho[4]. En términos generales, al dictar sentencia sumaria, el tribunal deberá hacer lo siguiente:

(1) analizar los documentos que acompañan la solicitud de sentencia sumaria y los que se incluyen con la moción en oposición, así como aquellos que obren en el expediente del tribunal;

(2) determinar si el oponente de la moción controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos[5].

---

[4] *Maldonado v. Cruz*, 161 DPR 1, 39 (2004), *Birriel Colón v. Econo y otro*, 2023 TSPR 120, 213 DPR ___ (2023); *Segarra Rivera v. Int'l Shipping et al.,* 208 DPR 964, 979 (2022).

[5] *Vera v. Dr. Bravo*, 161 DPR 308, 334 (2004).

Analizados estos criterios, el tribunal no dictará sentencia sumaria cuando existan hechos materiales y esenciales controvertidos; cuando haya alegaciones afirmativas en la demanda que no han sido refutadas; cuando surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material y esencial, o cuando como cuestión de derecho, no procede[6]. La sentencia sumaria se puede dictar a favor o en contra de la parte que la solicita, según proceda en Derecho[7].

Por tratarse de un remedio discrecional, el uso del mecanismo de sentencia sumaria tiene que ser mesurado y solo procederá cuando el tribunal quede claramente convencido de que tiene ante sí documentos no controvertidos[8]. De tal manera, solo procede dictar sentencia sumaria cuando surge claramente que el promovido por la moción no puede prevalecer bajo ningún supuesto de hechos y que el tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia[9]. Cuando no existe una clara certeza sobre todos los hechos de la controversia, no procede una sentencia sumaria[10]. Cualquier duda sobre la existencia de una controversia sobre los hechos materiales, debe resolverse contra la parte promovente[11]. Toda inferencia que se haga a base de los hechos y documentos que obren en los autos, debe tomarse desde el punto de vista más favorable al que se opone a la solicitud de sentencia sumaria[12]. Así pues, tomando en consideración que la sentencia sumaria es un remedio de carácter discrecional, "[e]l sabio discernimiento es el principio rector para su uso porque, mal

---

[6] *Íd.*, págs. 333-334. *Acevedo Arocho v. Depto. Hacienda y otros*, 212 DPR 335, 350 (2023); *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 335 (2021).
[7] *Maldonado v. Cruz, supra.*
[8] *Íd.*, pág. 334.
[9] *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 DPR 714 (1986).
[10] *Metrop. de Préstamos v. López de Victoria*, 141 DPR 844 (1996).
[11] *Audiovisual Lang. v. Sist. Est. Natal Hnos.*, 144 DPR 563 (1997).
[12] Véase, *Piñero v. AAA*, 146 DPR 890 (1998); *Audiovisual Lang. v. Sist. Est. Natal Hnos.*, *supra.*

utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido proceso de ley"[13].

Es importante mencionar que, este Tribunal utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una moción de sentencia sumaria[14]. Por consiguiente, los criterios que este foro intermedio debe tener presentes al atender la revisión de una sentencia sumaria son los siguientes:

(1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil y la jurisprudencia le exigen al foro primario;

(2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36;

(3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

(4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia[15].

Por último, a la modalidad de sentencia sumaria por insuficiencia de la prueba le aplican todos los principios que deben utilizarse por los tribunales al resolver una solicitud de sentencia sumaria[16]. Por ello, "cuando existe duda sobre si hay o no prueba suficiente o si hay una controversia de hecho, esta duda debe resolverse en favor de la parte promovida"[17].

**-B-**

Una vez perfeccionado un contrato, surge la obligación de cumplir con las debidas prestaciones, según pactadas por las partes so pena de responder por los daños ocasionados por tal inobservancia. A esos efectos, el Art. 1210 del Código Civil de 1930 dispone que:

---

[13] *Roig Com. Bank v. Rosario Cirino*, 126 DPR 613, 617 (1990) (énfasis suplido).
[14] *Íd.*
[15] *Meléndez González v. M. Cuebas*, 193 DPR 100, 118-118 (2015).
[16] *Medina v. M.S. & D. Química P.R., Inc.*, 135 DPR 716, 734 (1994).
[17] *Íd.*

> Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley[18].

Las acciones de daños *ex contractus* son aquellas mediante las cuales se reclaman daños derivados del incumplimiento contractual. Al respecto, el Art. 1054 del Código Civil de 1930 expresa que:

> Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas[19].

De tal manera, la "[c]ulpa contractual es la que surge del incumplimiento de las obligaciones que han convenido los contratantes. *Éstos han establecido unas normas que se han obligado a cumplir, y de su incumplimiento, cuando es imputable a uno de ellos surge la culpa*[20]. Los actos de incumplimiento contractual se refieren a actos u omisiones voluntarios que conllevan la inobservancia de obligaciones anteriormente acordadas[21]. Acorde, nuestro Tribunal Supremo ha dictaminado categóricamente que *"únicamente procede la acción en daños contractuales (Art. 1054) cuando el daño sufrido exclusivamente surge como consecuencia del incumplimiento de una obligación específicamente pactada, daño que no ocurriría sin la existencia del contrato"*[22].

En cuanto a la indemnización, sujeto a mayor cuantía dependiendo de si la actuación de incumplimiento fue de buena fe o

---

[18] Cód. Civ. PR art. 1210, 31 LPRA sec. 3375 (derogado).
[19] *Íd.*, sec. 3018.
[20] *Maderas Tratadas v. Sun Alliance*, 185 DPR 880, 907 (2012).
[21] *Íd.*, pág. 909.
[22] *Maderas Tratadas v. Sun Alliance*, *supra*, págs. 909-910 (2012); *Ramos Lozada v. Orientalist Rattan Furniture, Inc.*, 130 DPR 712, 727 (1992). Hacemos la salvedad de que aquí, los calificativos de "únicamente" y "exclusivamente" responden a que en la jurisprudencia de donde surge la cita se está marcando la diferencia entre daños por incumplimiento contractual y por responsabilidad extracontractual. De manera que, si se alega daños contractuales, proceden solo si los daños pueden trazarse a una obligación pactada que se incumplió y no si se trazan a la obligación general de *alterum non laedere* que impone la responsabilidad aquiliana.

dolosa, expresa el Código Civil de 1930 (derogado) que *[l]a indemnización de daños y perjuicios comprende no sólo el valor de la pérdida que haya sufrido, sino también el de la ganancia que haya dejado de obtener el acreedor*[23]. El Máximo Foro Judicial ha expresado que estas reclamaciones tienen por objeto que se cumpla con las promesas contractuales sobre las cuales las partes prestaron su consentimiento[24].

Por su parte, *para probar un reclamo de daños, es necesario que se presente evidencia real, es decir, las meras alegaciones no constituyen prueba*[25]. Además de probar los daños y el incumplimiento culposo o doloso de la obligación contractual, **el reclamante debe demostrar la relación causal entre el incumplimiento y los daños**[26]. Así, "debe existir una relación de causa a efecto entre el incumplimiento y los daños sobrevenidos"[27].

### III.

Nuestro Tribunal Supremo ha expresado que el tribunal apelativo, como foro revisor, utilizará los mismos criterios que el foro primario al determinar si procede una solicitud de sentencia sumaria. Sin embargo, el foro revisor solo considerará aquellos documentos presentados ante el foro primario, determinará si existe o no una controversia de hechos esenciales y si se aplicó el Derecho correctamente[28].

En el recurso ante nuestra consideración, discutiremos primeramente si las partes y el foro primario cumplieron con los criterios de la Regla 36 de Procedimiento Civil y la jurisprudencia[29].

---

[23] 31 LPRA sec. 3023 (derogado).
[24] *Trinidad v. Chade*, 153 DPR 280, 290 (2001); *Santiago Nieves v. A.C.A.A.*, 119 DPR 711, 716 (1987).
[25] *UPR v. Hernández*, 184 DPR 1001, 1013 (2012).
[26] *Ferrer v. Telephone Co.*, 209 DPR 574, 581 (2022).
[27] *Muñiz Olivari v. Stefel Laboratories Inc.*, 174 DPR 813, 819 (2008).
[28] *Reyes Sánchez v Eaton Electrical*, 189 DPR 586, 596 (2013).
[29] Véase, 32 LPRA Ap. V, R. 36; *Meléndez González et al. v. M. Cuebas*, 193 DPR 100 (2015).

Posteriormente, discutiremos los errores argumentados por la parte apelante y los fundamentos para el dictamen apelado.

Como asunto preliminar, pasemos a evaluar si, tanto la *Moción de Sentencia Sumaria*, así como la *Oposición a Moción de Sentencia Sumaria,* cumplieron con las formalidades impuestas por la Regla 36.3 de las de Procedimiento Civil.

Los requisitos de forma que exige la Regla 36 de las de Procedimiento Civil deben ser celosamente observados, toda vez que, según la misma regla, cuando una moción de sentencia sumaria se presente y esta cumpla con sus requisitos de forma "la parte contraria no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica como lo haya hecho la parte promovente"[30]. De no cumplirse con este mandato, se dictará la sentencia sumaria en su contra si procede en derecho. Asimismo, no tendremos que considerar "aquellos hechos que no han sido específicamente enumerados y que no tienen una referencia a los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen"; igualmente no tendremos que considerar "cualquier parte de una declaración jurada u otra prueba admisible en evidencia a la cual no se haya hecho referencia en una relación de hechos"[31].

Ante este marco normativo, evaluada la *Moción de Sentencia Sumaria* presentada por el apelado ante el TPI el 10 de junio de 2024, determinamos que esta cumple con todos los requisitos de forma exigidos por la Regla 36 de las de Procedimiento Civil, incluyendo los exhibits sometidos para sustentar su petitorio. Igualmente, encontramos que la *Oposición a Moción de Sentencia Sumaria* presentada por la parte apelante el 22 de julio de 2024,

---

[30] *Íd.*, R. 36.3(c).
[31] *Íd.*, R. 36.3(d).

cumple cabalmente con los requisitos de forma.

En cuanto a la *Sentencia Sumaria*[32], el TPI desestima la demanda al amparo de la Regla 36.3 de Procedimiento Civil[33]. Además, determina treinta y un (31) hechos que no están en controversia, los cuales acogemos. A su vez, basa su análisis en la prueba documental de las mociones dispositivas, así como las presentadas en el juicio previo sobre incumplimiento de contrato. Entre las piezas probatorias que tuvo el TPI ante su consideración y este foro examina de *novo,* son:

1. *"Agreement between Anesthesiologists and Doctors' Center Hospital, Inc";*
2. Informe pericial de la parte apelante, del perito Reynaldo Quiñones;
3. Informe pericial del apelado, del perito José Toral;
4. Las deposiciones realizadas al Dr. Porro del 15 de febrero de 2014 y del 22 de diciembre de 2022;
5. Carta del 26 de abril de 2012;
6. Transcripción de la Prueba oral vertido en el juicio en su fondo entre el 7-9 de agosto de 2018 y el 3-6 de diciembre de 2018 sometida antes nuestra consideración.

En síntesis, en los tres errores que esboza la parte apelante en su escrito de *Apelación,* insiste que debemos revocar la *Sentencia Sumaria* emitida por el TPI, toda vez que existen controversias reales sustanciales en cuanto a hechos materiales. Pues, según la parte apelante, el TPI erró al concluir que no existe un nexo causal entre la cancelación del contrato por parte de DCH y los daños contractuales y al encontrar que el informe pericial de su perito Reynaldo Quiñones no logra establecer dicho nexo causal. Estos daños contractuales, según arguye la parte apelante en su *Apelación,* son ganancias dejadas de devengar y beneficios dejados de percibir.

En cambio, el apelado sostiene que actuó correctamente el foro primario al desestimar la causa de acción, toda vez que la parte apelante no logró establecer con suficiencia un nexo causal entre la

---

[32] Véase apéndice del recurso, págs. 1-12.
[33] 32 LPRA Ap. V, R. 36.3.

cancelación del contrato por parte de DCH y los daños contractuales alegados.

Tras un examen minucioso del legajo apelativo, colegimos que el *""Agreement between Anesthesiologists and Doctors' Center Hospital, Inc."*[34], fue el contrato otorgado entre las partes. Conforme al Código Civil[35], una vez las partes prestan su consentimiento, estos quedarán obligados al cumplimiento de la obligación pactada, pues "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de estos[36]. Retornando al examen del *Agreement between Anesthesiologists and Doctors' Center Hospital, Inc."*[37], la cláusula II del contrato[38] dispone sobre las obligaciones de las partes. También, estas fueron consignadas por el foro primario en las determinaciones de hechos #10 y #11. Fíjese que, las obligaciones y responsabilidades del Dr. Porro como DC Anesthesia era encargarse del costo de nómina del personal contratado por la parte apelante, incluyendo anestesistas y el personal administrativo del Departamento de Anestesia. Así como DC Anesthesia le correspondía facturar por los servicios rendidos por el Dr. Porro, y su equipo de trabajo, cobraba los mismos y registraba estos procesos en sus récords de contabilidad, además, pagaba todos los costos y gastos operacionales relacionados con la prestación de los servicios, los gastos generales y administrativos relacionados, y los servicios profesionales y/o salarios del personal que prestaba los servicios, incluyendo, entre estos, al Dr. Porro.

---

[34] Véase apéndice del recurso, págs. 113-130.
[35] El Código Civil de Puerto Rico de 1930 fue derogado por el Código Civil de Puerto Rico de 2020 aprobado mediante la Ley Núm. 55 de 1 de junio de 2020. Para fines de la presente, se hace referencia únicamente al Código Civil derogado por ser la ley vigente y aplicable a la controversia que nos ocupa.
[36] Art. 1044 del Código Civil, 31 LPRA sec. 2994.
[37] Véase apéndice del recurso, págs. 113-130.
[38] *Íd.*, págs. 116-118.

Además, el contrato otorgado por las partes detalla la responsabilidad del apelado. En otras palabras, los términos del contrato son claros, y no dejan lugar a dudas sobre la intención de los contratantes[39]. Así pues, los tribunales de justicia no pueden relevar a una parte de cumplir con lo que se obligó, ya sea dar, hacer o no hacer mediante contrato, cuando dicho contrato es legal y válido y no contiene vicio alguno"[40]. Al aplicar esta normativa en unión a la prueba que obra en el expediente de autos, es nuestro entender que el TPI tuvo ante si todos los requisitos de la Regla 36.3(e) de las de Procedimiento Civil[41]. Es decir, surge claramente que la parte apelante no puede prevalecer bajo ningún supuesto de hechos y que el TPI cuenta con los elementos y todos los hechos necesarios para poder resolver la controversia.

Entiéndase, que la parte apelante no logra establecer una relación causal entre el incumplimiento contractual y los presuntos daños sufridos bajo ningún estándar razonable. Recordemos que, únicamente procede la acción *ex contractus* cuando el daño sufrido surge exclusivamente como consecuencia del incumplimiento de una obligación específicamente pactada. Por tanto, si los presuntos daños sufridos no logran trazarse a una obligación incumplida, la causa de acción no procederá. A continuación, esbozamos nuestro razonamiento.

Primero, **no existe una controversia genuina en cuanto a que la parte apelante se encontraban en <u>déficit financiero desde <em>antes</em> de la cancelación del contrato</u>**. Asimismo, la parte apelante no controvirtió el hecho de que el factor determinante de su déficit financiero fue que **desde mediados del 2011 *las tarifas bajo el***

---

[39] Artículo 1233 del Código Civil de Puerto Rico. 31 LPRA ant. sec. 3471; *Rivera v. Rivera*, 168 DPR 193, 212 (2006); *Trinidad v. Chade*, 153 DPR 280, 289 (2001); *Marcial v. Tomé*, 144 DPR 522, 536 (1997).

[40] *García v. Worldwide Entertainment Co.,* 132 DPR 378 (1992), *Cervecería Corona v. Commonwealth Ins. Co.,* 115 DPR 345 (1984).

[41] 32 LPRA Ap. V, R. 36.3(e).

**plan de "la Reforma" sufrieron una seria reducción**[42] **a la vez que *hubo un aumento significativo de pacientes de "la Reforma"* que atendiera el Dr. Porro**[43], ya que el Gobierno de Puerto Rico canceló la contratación del servicio de salud con MCS y, en octubre de 2011, seleccionó y nombró a Triple-S como el proveedor del plan de salud del Gobierno de Puerto Rico. El aumento de pacientes del plan de salud gubernamental se debe a que el Dr. Porro era un médico proveedor de la mencionada aseguradora. De tal manera, Triple-S le ofreció al Dr. Porro adquirir 'pasivamente' los derechos contractuales sobre el nuevo acuerdo con el Gobierno. A tal efecto, el Dr. Porro se negó a aceptar el contrato y las tarifas bajas tal cual, y comenzó a cobrar y establecer planes de pago directamente a los pacientes a las tarifas de Triple-S regular, a la vez que facturaba al plan de salud del Gobierno ciertos servicios a sus tarifas bajas debido a que su relación 'pasiva' con la aseguradora continuaba[44]. A esto se le añade el hecho de que el Dr. Porro admitió que, para el año 2011, MCS Reforma le adeudaba unos 500 mil dólares, de los cuales, solo obtuvo alrededor de unos 300 mil[45]. Es decir, su situación financiera crítica en nada se relaciona al incumplimiento contractual que ocurrió en abril de 2012; claramente, se debe a la relación económica defectuosa entre el Dr. Porro y los planes de salud del Gobierno.

---

[42] Apéndice de los Apelantes, pág. 178 (donde el Dr. Porro depone que las tarifas de anestesia se redujeron un 80% bajo el nuevo cambio de plan de salud de "la Reforma"). *Cf*, *Íd.*, pág. 672 (donde el perito Reynaldo Quiñones expresa que las nuevas tarifas del nuevo plan de salud del Estado "representaban una reducción de entre 40% a un 60% de las tarifas establecidas por MCS por servicios de anestesiología").

[43] Véase, Apéndice del Apelado, págs. 31-33 (sobre el aumento significativo de pacientes con plan médico del Estado a finales del año 2011 y las bajas tarifas que proveía el plan médico del Estado). Véase también, *Íd.*, pág. 64 (donde el Dr. Porro testifica que el número total de pacientes atendidos bajo el plan de salud del Estado rondaba entre un 40% y 50% de la población total). *Cf*, Apéndice de los Apelantes, págs. 173-175 (donde el Dr. Porro depone que antes del cambio del plan de salud del Estado en el 2011 solo un 10% de sus pacientes era de "la Reforma").

[44] Apéndice del Apelado, págs. 51-60.

[45] Apéndice de los Apelantes, págs. 186-187.

Segundo, **la parte apelante no logra establecer unos ingresos confiables sobre los cuales pueda hacerse una estimación fiel de ciertos ingresos futuros que fueron presuntamente frustrados por la cancelación prematura del contrato**. Por sus propias admisiones, el Dr. Porro no había devengado un sueldo de DC Anesthesia por un total de seis (6) meses antes de la cancelación unilateral del contrato[46]. A esto se le añade el hecho de que en la comunicación del 26 de abril de 2012 ya el Dr. Porro anunciaba la inestabilidad e insostenibilidad de su empresa cuando expresó que "continuamente carecemos de fondos para el pago de las nóminas y las estamos subsidiando con líneas de crédito. La situación es tan crítica que al presente no tenemos dinero para pagar la nómina del próximo 30 de abril de 2012"[47]. Incluso, el propio Dr. Porro expresó en la vista en su fondo del 8 de agosto de 2018, refiriéndose a lo expresado en la misiva del 26 de abril de 2012, que *"yo iba a terminar esa relación contractual por mi parte. Claro, siguiendo los, las, las cláusulas estipuladas en el contrato de servicios"*[48]. Es decir, el contrato era uno insostenible bajo los nuevos cambios en los planes de salud del Gobierno y el mismo Dr. Porro lo hubiese cancelado. Por lo cual, ninguna Planilla o Declaración Informativa sobre Ingresos del Dr. Porro o DC Anesthesia ponen genuinamente en controversia el hecho de la situación económica crítica de la parte apelante ni establecen una relación causal entre el incumplimiento contractual y una presunta falta de ingresos.

---

[46] Apéndice del Apelado, pág. 319. Véase también, *Íd.*, pág. 21.

[47] Debemos hacer el señalamiento de que, a pesar de los contratiempos financieros, los Apelantes pudieron pagar la nómina de 30 de abril de 2012 (mes en que fue cancelado el contrato) debido a que llegaron fondos al sistema INMEDIATA correspondientes a los pagos de los planes médicos atrasados en la misma fecha de la cancelación del contrato. *Íd.*, pág. 131. Asimismo, los Apelantes trabajaban para lograr adquirir una nueva línea de crédito con qué pagar las nóminas. Apéndice de los Apelantes, págs. 219-221.

[48] Apéndice del Apelado, pág. 103.

Tercero, **el informe pericial de Reynaldo Quiñones es insuficiente para establecer una relación causal entre la cancelación y los presuntos daños** de falta de ingresos y **beneficios marginales**. Esto es así por las siguientes razones: (1) no contempló la situación económica real del apelante al momento de la cancelación del contrato, según hemos descrito; (2) calculó las ganancias generadas a base de los ingresos devengados durante el periodo que DC Anesthesia ofrecía servicios bajo las tarifas de MSC y no bajo el tarifario reducido aplicable de Triple S; (3) para determinar la "Ganancia proyectada" del Dr. Porro, sumó las cantidades contenidas en la Declaración Informativa del 2011 (la cual en su mayor parte se basan en las tarifas viejas antes del cambio en el plan de salud del Gobierno) más un estimado de compensación dejada de cobrar en los últimos (2) meses del año 2011 (lo cual se debía precisamente a los cambios en "la Reforma"); (4) no contempló las planillas de DC Anesthesia de los años contributivos 2011 en adelante; (5) nada dispuso sobre la falta de consideración de la reducción de tarifas que surgió con el cambio de "la Reforma"[49]. Por estas mismas razones, el informe pericial es hartamente especulativo, lo cual lo hace falto de confianza para poner en controversia genuinamente un hecho material. Incluso, el informe pericial es huérfano de un análisis causal que establezca un hilo conductor entre el incumplimiento contractual y los presuntos daños. Todo ello imposibilita una causa de acción para recuperar daños por ingresos y beneficios dejados de recibir, puesto que no hay un fundamento confiable sobre el cual estimarlos.

En su petitorio de Sentencia Sumaria, el apelado demostró que la prueba descubierta no satisface los elementos necesarios para establecer la causa de acción reclamada. Por el contrario, la

---

[49] Véase, Apéndice de los Apelantes, págs. 664-715.

parte apelante no fundamenta adecuadamente su oposición para justificar que, en efecto, merece su "día en corte"[50]. Claro está, el foro primario resuelve conforme a la aplicación de todos los requisitos de la Regla 36.3 de las Reglas de Procedimiento Civil, *supra*. Ante ello, colegimos que, ninguno de los errores esbozados fue cometido por el foro primario.

**IV.**

Por los fundamentos antes expuestos, ***confirmamos*** la *Sentencia Sumaria* apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[50] *Medina v. M.S. & D. Química P.R., Inc.,* 135 DPR 716, 732- 734 (1994).